[No. C018768. Third Dist. July 20, 1995.]

SUSANNA JACOBS, Plaintiff and Appellant, v.
FIRE INSURANCE EXCHANGE, Defendant and Respondent.

BRUCE W. BUSCH, as Administrator, etc., Plaintiff and Appellant, v.
FIRE INSURANCE EXCHANGE, Defendant and Respondent.

**COUNSEL**

Eisen & Johnston, Jay-Allen Eisen, Marian M.Johnston, Ann Perrin Farina, Clayeo C. Arnold, Douglas E. Stein, Crow, Sevey, Gilwee, Britt, Weninger, Alpar, Tronvig, White & Simlick, James F. Gilwee and Gerald J. Adler for Plaintiffs and Appellants.

Diepenbrock, Wulff, Plant & Hannegan, Dennis M. Campos, Felicita S. Fields and Sean O. Sheridan for Defendant and Respondent.

## OPINION

**SIMS, J.**—In separate actions, plaintiffs Susanna Jacobs and Bruce W. Busch, as administrator of the estate of Jesse Aguilar (deceased), filed suit against Aguilar's insurer, defendant Fire Insurance Exchange (FIE), under Aguilar's homeowners policy, due to FIE's refusal to pay a civil judgment Jacobs obtained against Aguilar's estate for gunshot injuries inflicted by Aguilar. The trial court granted FIE's motion for summary judgment on the basis the shooting was willful and therefore excluded from coverage under Insurance Code section 533 (hereafter section 533[1]) and under an express exclusionary clause in the insurance contract.

The critical issue in this appeal by plaintiffs is their contention that a triable issue of material fact exists as to whether Aguilar's conduct was not willful but rather the product of a mental disorder which rendered him unable to control his conduct, a circumstance which assertedly would allow coverage. We shall conclude volitional incapacity, or an "irresistible impulse," does not negate a "willful act" under section 533 where the insured retains cognitive capacity. Finding no triable issue regarding Aguilar's cognitive capacity to understand the nature, consequences and wrongfulness of his conduct, we shall affirm the judgment.

### FACTUAL AND PROCEDURAL BACKGROUND

Jacobs was 16 years old when Aguilar shot her on August 8, 1989. Aguilar, in his 40's at the time of the shooting, had been sexually molesting Jacobs since she was 12 years old when he coached her Little League team. She did not report the molestation because he repeatedly threatened to kill her and her family if she told anyone.

Aguilar maintained the relationship through the years and also tried to dominate Jacobs's life by controlling her activities and contact with others.

Shortly before the shooting, in response to Aguilar's persistent accusations, Jacobs falsely told him she was having a lesbian relationship with a friend. Aguilar told her to end that involvement or he would kill her. Jacobs tried to break off her relationship with Aguilar. He became more obsessed, following her and calling her at work and at home, apparently unconcerned with publicizing his fixation.

Several days before the shooting, Aguilar asked a friend if he could borrow a handgun to go hunting. The friend pointed out a handgun is not

---

[1]Section 533 provides: "An insurer is not liable for a loss caused by the wil[l]ful act of the insured; but he is not exonerated by the negligence of the insured, or of the insured's agents or others."

used for hunting. Aguilar later returned to his friend and said he was going camping and wanted to take along a handgun for protection. The friend agreed to lend Aguilar a handgun.

On the day of the shooting Aguilar picked up the gun and ammunition from his friend and received instruction on how to load and use the weapon. Aguilar then sought out Jacobs late in the afternoon and asked her to accompany him to a softball game. She declined but relented when Aguilar threatened to kill her.

Aguilar drove Jacobs onto the freeway, telling her he did not want her seeing her female friend, and he was going to take care of that situation. He showed her the gun and told her he intended to take her to the woods, kill her, bury her body, and hide out in Los Angeles.

Jacobs jumped out of the truck, though it was traveling more than 65 miles per hour.

Aguilar drove back to the site where Jacobs was sitting by the side of the road, speaking with passersby who had stopped to assist her, including a deputy sheriff and highway patrol officer. Aguilar concealed the gun under a jacket too heavy for the hot August day. He walked toward Jacobs, who began screaming. When witnesses asked him if he was involved with the injured girl, Aguilar shook his head "no." Aguilar stopped a few feet from Jacobs, aimed the gun at her with both hands and pulled the trigger. She received a gunshot wound to the head, leaving her severely and permanently injured. Aguilar then shot and killed himself.

Autopsy toxicology reports disclosed Aguilar did not have alcohol or drugs in his system when he died.

At the time of the shooting, Aguilar had a homeowners insurance policy with FIE.

Jacobs sued Aguilar's estate for negligent infliction of damages for her injuries. Apparently, the molestation was originally alleged but was dismissed before trial, and the case proceeded on the shooting incident only. FIE defended the estate under a reservation of rights, denying coverage

under both section 533 and a policy exclusion. The jury awarded Jacobs $5.2 million. FIE refused to pay the judgment.[2]

On March 8, 1993, the administrator of Aguilar's estate filed a complaint against FIE for breach of contract and breach of the implied covenant of good faith and fair dealing, based on FIE's refusal to settle with Jacobs or pay the judgment. This complaint alleged Aguilar shot Jacobs "while acting in a fit of rage and unable to control his actions; and while operating under an irresistible impulse as a result of mental disorder and illness which prevented [Aguilar] from forming a preconceived intent to harm; and because of diminished mental capacity making him unable to understand the consequences of his actions or to contemplate the moral and legal propriety of his actions." The complaint also alleged Aguilar suffered from medical conditions which affected his ability to control his actions.

On March 16, 1993, Jacobs filed a "COMPLAINT (ACTION BY JUDGMENT CREDITOR AGAINST INSURER FOR DAMAGES FOR BREACH OF CONTRACT-LIABILITY INSURANCE, REFUSAL OF INSURER TO PAY JUDGMENT AGAINST INSURED)." This complaint alleged that at the time of the shooting Aguilar was "acting under an irresistible impulse and/or mental, physical or emotional condition which prevented him from understanding the nature and consequences of his actions" and shot Jacobs in the head "negligently, without intent, or the ability to understand the nature and consequences of his actions."

The two complaints against FIE were consolidated for all pretrial purposes.

On October 15, 1993, FIE filed its motion for summary judgment as to both complaints, on the ground that Aguilar's conduct was willful and therefore coverage was barred by policy terms and by section 533. In support of the motion FIE submitted evidence reflecting an intentional shooting intended to harm, in that Aguilar (1) obtained a handgun under false pretenses, (2) coerced Jacobs to accompany him in his truck and told her he was going to kill her, (3) sought her out by returning to the site where she jumped from the truck, (4) denied involvement with her when questioned by witnesses as he approached her on foot, (5) concealed his weapon with a coat, and (6) aimed at her with both hands and pulled the trigger.

FIE also submitted a declaration of licensed psychologist Herbert N. Weissman, Ph.D., who reviewed (1) medical records and deposition testimony from Aguilar's physicians, (2) testimony of witnesses, family members, and friends, (3) investigative reports from law enforcement agencies,

---

[2]Plaintiffs assert the jury in the negligence action found Aguilar acted under an irresistible impulse. However, the citation to the record shows a general verdict form which contains no such finding.

and (4) Aguilar's employment records. Based on his review, Dr. Weissman opined Aguilar knew what he was doing and knew that it was wrong. He found the foregoing facts significant as "reflecting presence of mind and planfulness, and also that [Aguilar] knew it was a weapon, and that his intended actions were wrong." Dr. Weissman found no indication that Aguilar's medical conditions (including diabetes, hypertension, and hyperthyroidism) or medications taken for those conditions were a factor in his behavior.

Dr. Weissman further attested: "Regarding mental health, there is no history of diagnosed mental or emotional impairment, no history of psychotherapy, counseling, or psychiatric hospitalization. Further, there is no recordation by any physician of any pattern of mental or emotional conditions or syndromes. Hence, there are no liability precursors in mental and/or emotional symptoms or conditions that suggest impaired capacity on August 8, 1989. Further, attempted murder and suicide do not just occur among the mentally or physically ill. It is well recognized in the literature that homicides and suicides occur in the absence of either condition. The act of suicide does not itself imply that the actor was either mentally ill or insane."

Dr. Weissman observed the evidence indicated jealousy and anger in Aguilar. It further appeared he was compulsive in his obsessional involvement with Jacobs, and compulsive persons tend to be planful and organized in their conduct.

Thus, Dr. Weissman opined that "Aguilar was legally sane at the time of the commission of these acts—that he was able to appreciate the nature and quality of his acts, and that they were wrong . . . ."

In opposition to the motion, Aguilar's estate submitted a declaration from psychiatrist Robert M. Bittle, M.D., who assisted the defense in the underlying lawsuit. Dr. Bittle was of the opinion, based on his document review, examination of Jacobs and involvement in the case, that "there is a high medical probability that from the time . . . Jacobs exited . . . Aguilar's truck and at the time of the shooting, as a result of mental defect, . . . Aguilar's judgment was so grossly disturbed and impaired that he *lacked the capacity to govern his conduct in accordance with reason.*" (Italics added.)

Jacobs's opposition to the summary judgment motion presented a declaration from licensed psychologist Paul Berg, Ph.D., who expressed the opinion, based on his review of discovery in the case, that "more likely than not, at the time of the shooting . . . Aguilar was suffering from a brief reactive psychosis which caused . . . Aguilar to *lack the substantial capacity*

*to understand the nature and consequences of his actions.*" (Italics added.) Dr. Berg further opined that "more likely than not, . . . Aguilar was suffering from, at the very least, an impulse disorder that *prevented him from having the substantial capacity to govern his own conduct* at the time of the shooting."[3]

Jacobs's opposition to the summary judgment motion also presented portions of Dr. Weissman's deposition testimony, in which Dr. Weissman stated "it's possible" Aguilar was suffering from an impulse control disorder. A person with an impulse control disorder may or may not be able to resist impulses. Weissman also said the attempted murder and suicide were not consistent with how Aguilar had lived his life before the incident.[4]

Plaintiffs submitted evidence that Aguilar suffered depression as a result of an automobile accident a year before the shooting. Plaintiffs also presented evidence that certain physical conditions suffered by Aguilar (hyperthyroidism, diabetes) might affect a person's state of mind in terms of agitation, nervousness, or exacerbation of mental instability. Plaintiffs also challenged FIE'S reliance on Jacobs's testimony because the shooting impaired her memory.

In its reply to plaintiffs' opposition to the motion, FIE submitted deposition testimony of Dr. Bittle in which he was asked his opinion as to whether Aguilar intended to shoot Jacobs. Dr. Bittle responded: "At the time he did it, it appears based on all the information I have available to me that he intended to shoot her."

FIE also presented deposition testimony of Dr. Berg stating, "I think he probably did know he was shooting a gun. I don't know for sure, but I would guess he did know." Dr. Berg said he had no opinion as to whether Aguilar

---

[3]Thus, Dr. Berg's declaration spoke to both cognitive capacity (to know the nature of one's actions) and volitional capacity (to be able to control one's conduct).

[4]Plaintiffs assert Dr. Weissman agreed the diagnoses of Drs. Bittle and Berg could represent a reasonable medical opinion on the known facts, though Dr. Weissman disagreed with them. However, to the extent plaintiffs refer to a diagnosis of mental incapacity to perform a willful act, the record does not bear out their assertion. The cited portion of the record shows only the following: "MR. STEIN [Jacobs's attorney]: In your opinion, based upon the information you looked at, could a competent psychologist hold a different opinion than you with regard to whether or not Mr. Aguilar had a compulsive obsessive personality [no punctuation] [¶] MR. STEIN [*sic*: Dr. Weissman?]: Absolutely." This does not constitute a concession regarding a diagnosis of mental incapacity to commit a willful act.

comprehended that shooting a gun at Jacobs would injure her.[5] Dr. Berg further agreed, however, that "for the diagnosis of impulse control disorder to apply, it has to be in sync with what they want," i.e., "the act is ego-syntonic in that it is consonant with the immediate conscious wish of the individual . . . ."

FIE's reply papers presented evidence, including deposition testimony of plaintiffs' medical and psychiatric experts, that Aguilar's physical conditions were not a causative factor in his behavior at the time of the shooting.

In February 1994, the trial court granted FIE's summary judgment motion.

Plaintiffs moved for reconsideration. Additional deposition testimony from Drs. Berg and Bittle was submitted.

Dr. Bittle's deposition included the following:

"Q. Do you have an opinion as you sit here today as to whether or not at the time of the shooting Jesse Aguilar knew that he was shooting a gun?

"A. *In my opinion based upon all of the information I think that it's more medically probable than not that he was aware he was shooting the gun.*

". . . . . . . . . . . . . . . . . . . . . . .

"Q. Do you also hold an opinion as to whether he was aware at the time of the shooting that shooting a gun at someone was likely to cause harm to them?

"A. I believe that the right versus wrong issue from a moral standpoint is highly questionable, and I think that it's more medically probabl[e] than not that at this point in time he was so totally out of control that *he would have difficulty distinguishing right from wrong.*

"Q. That wasn't my question, sir. My question was whether at the time of the shooting, in your opinion, he knew that shooting a gun would harm somebody.

"A. *He probably at the time that he shot the gun knew that it would harm.*

"Q. But you're saying that in your opinion to a reasonable medical certainty he did not know that shooting a gun at someone and harming them was wrong?

---

[5]Thus, Dr. Berg's deposition testimony conflicted with his declaration, quoted above, which declared Aguilar lacked the capacity to understand the nature and consequences of his actions.

"A. I believe that *his judgment secondary to his mental state at this point in time seriously interfered with his ability to morally distinguish right from wrong.*" (Italics added.)

Dr. Bittle further testified: "At that point in time I believe . . . Aguilar, as soon as she jumped out of the truck, felt he had lost total control of the situation at that point in time. His delusional beliefs, his level of anxiety had reached a point where he was mentally out of control and *cognitively could not control his behavior*, and that he was acting on this false belief that he had lost her and lost this love object that had been introjected into himself over the preceding four or so years, and that the suicide was a symbolic destruction of himself and the introjected love object." (Italics added.)

Although this testimony appears to mix cognition and volition, Dr. Bittle clarified later in the deposition:

"Q. *So have you now changed your opinion from what it was before we took the break, that he intended to shoot her at the time of the shooting?*

"A. *At the time he went up there to shoot her, he did.*

"Q. *That he intended to shoot her.*

"A. *Right.*

"Q. *But he couldn't control it.*

"A. *Exactly.*" (Italics added.)

Dr. Berg's deposition reiterated his opinion that "more likely than not at the time of the shooting Jesse Aguilar was suffering from a brief reactive psychosis" stemming from a delusional paranoid disorder. That psychosis, which was developing over a period of a couple of weeks, either caused him to shoot her or he shot her while he was suffering from it. Dr. Berg believed Aguilar "snapped," which he defined as follows: "Snapped means you lost it. It means you no longer have control over your faculties. It means you begin to act in uncontrolled, tumultuous, turmoil-laden ways."

The trial court denied the motion for reconsideration.

On April 28, 1994, judgment was entered in favor of FIE on both complaints.

## DISCUSSION

### I. *Standard of Review*

A motion for summary judgment will be granted if the moving papers establish that there is no triable issue of material fact and the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c); see *Jambazian v. Borden* (1994) 25 Cal.App.4th 836, 843 [30 Cal.Rptr.2d 768].) A defendant may show entitlement to summary judgment either by showing one or more elements of each cause of action cannot be established, or by establishing an affirmative defense. (Code Civ. Proc., § 437c, subd. (n).)

"Since a summary judgment motion raises only questions of law regarding the construction and effect of the supporting and opposing papers, we independently review them on appeal, applying the same three-step analysis required of the trial court. [Citations.] First, we identify the issues framed by the pleadings since it is these allegations to which the motion must respond by establishing a complete defense or otherwise showing there is no factual basis for relief on any theory reasonably contemplated by the opponent's pleading. [Citations.] [¶] Secondly, we determine whether the moving party's showing has established facts which negate the opponent's claim and justify a judgment in movant's favor. [Citations.] The motion must stand self-sufficient and cannot succeed because the opposition is weak. [Citations.] . . . [¶] When a summary judgment motion prima facie justifies a judgment, the third and final step is to determine whether the opposition demonstrates the existence of a triable, material factual issue. [Citations.]" (*AARTS Productions, Inc. v. Crocker National Bank* (1986) 179 Cal.App.3d 1061, 1064-1065 [225 Cal.Rptr. 203].)[6]

### II. *Legal Insanity May Negate a "Willful Act" Under Section 533; However, the Issue Here Is Whether an Irresistible Impulse Qualified as a Species of Insanity Under Section 533*

█ Section 533 is an implied exclusionary clause read into all insurance contracts pursuant to statute. (*J. C. Penney Casualty Ins. Co. v. M. K.* (1991)

---

[6]The parties disagree as to who had the burden of proof on the issue of whether or not Aguilar was insane. Plaintiffs cite *Clemmer v. Hartford Insurance Co.* (1978) 22 Cal.3d 865, 879-880 [151 Cal.Rptr. 285, 587 P.2d 1098], which stated the insurer has the burden of proving a willful act under section 533. FIE cites the rule that the burden of proving insanity is on the person claiming insanity. (Evid. Code, § 522.)

However, we need not resolve this dispute because evidence was in fact adduced on both sides, and, as we shall explain, the evidence tenders no material dispute of fact.

We therefore need not decide which party in a section 533 case has the burden of proof on the sanity issue, or how that burden may be met.

52 Cal.3d 1009, 1019 [278 Cal.Rptr. 64, 804 P.2d 689].) It is subject to the rules of statutory construction, not the rule requiring strict interpretation of contracts against the insurer.[7] (*Ibid.*)

Section 533 does not bar coverage for injury incurred negligently or recklessly, though the injury may be said to result from a willful act as the term is commonly understood. (*J. C. Penney Casualty Ins. Co.* v. *M. K.*, *supra*, 52 Cal.3d at p. 1020.) "Willful act" as used in section 533 "means something more than the mere intentional doing of an act constituting ordinary negligence." (*Id.* at p. 1021, internal quotation marks omitted.) "[S]ection 533 does not preclude coverage for acts that are negligent or reckless." (*Ibid.*) The statute connotes an element of wrongfulness or misconduct. (*Id.* at pp. 1023-1024.) For example, an intentional assault committed in self-defense is not a willful act under section 533. (*Ibid.*)

Here, no issue is raised as to the existence of a willful act under section 533 if Aguilar was legally sane.[8] Plaintiffs do not assert the shooting was accidental or in self-defense. The issue in this case arises from the rule that legal insanity may negate a willful act under section 533. (See *J. C. Penney Casualty Ins. Co.* v. *M. K.*, *supra*, 52 Cal.3d at p. 1023 [dictum]; *Clemmer* v. *Hartford Insurance Co.*, *supra*, 22 Cal.3d 865.) However, as will appear, no controlling case law in this state defines insanity for purposes of section 533.

The traditional formulation of legal insanity in this state refers to cognitive capacity—the ability to understand the nature, consequences, and/or wrongfulness of one's conduct. (See, e.g., *Marceau* v. *Travelers' Ins. Co.* (1894) 101 Cal. 338 [35 P. 856], discussed *post.*) Although the bulk of their brief is devoted to the irresistible impulse theory, pursuant to which Aguilar lacked the *volitional* capacity to control his actions, plaintiffs intersperse an argument that a triable issue of material fact exists as to whether

[7]The insurance contract also contains an exclusionary clause for intentional acts. The contractual exclusionary clause cannot be construed more narrowly in favor of coverage than the statutory exclusion, because an insurance policy cannot provide coverage for acts excluded by section 533. (*J. C. Penney Casualty Ins. Co.* v. *M. K.*, *supra*, 52 Cal.3d at pp. 1019-1020, fn. 8.) FIE does not argue the express contractual exclusion is broader than the statute. Thus, we need not decide whether coverage would be excluded by the explicit contract clause in the absence of section 533.

[8]As we discuss *post*, plaintiffs suggest section 533 requires evidence not only of an intentional act but also of a preconceived design to inflict injury. However, where the act is inherently harmful and wrongful, and no question of insanity or justification is present, the design element is not required. (*J. C. Penney Casualty Ins. Co.* v. *M. K.*, *supra*, 52 Cal.3d 1009.) An intentional shooting at point-blank range is obviously intended to harm, if the actor is sane. (*Id.* at p. 1026 [dictum].) A nonaccidental assault without legal justification is inherently harmful and wrongful. (*Fire Ins. Exchange* v. *Altieri* (1991) 235 Cal.App.3d 1352, 1359-1360 [1 Cal.Rptr.2d 360].) Moreover, assuming for the sake of argument that intent to injure must be shown in addition to intent to commit the act, such design is amply shown by evidence that Aguilar told Jacobs he was going to kill her.

Aguilar had the *cognitive* capacity to understand the nature, consequences, and wrongfulness of his actions. However, we need not decide the scope of a cognitive capacity test because, even assuming a willful act under section 533 requires cognitive capacity to know the nature, consequences, and wrongfulness of one's actions, no triable issue exists in this case. Thus, FIE's expert opined Aguilar understood the nature and wrongfulness of his actions. Even plaintiffs' two psychiatric experts agreed in deposition that Aguilar understood the nature of his actions, i.e., that he was shooting a gun. One of plaintiffs' two experts opined Aguilar knew shooting the gun would harm Jacobs; the other expert had no opinion. As to wrongfulness, one of plaintiffs' experts opined only that Aguilar probably had "difficulty" distinguishing right from wrong. He did not opine Aguilar was unable to do so and thus did not contradict FIE's showing.

Although Dr. Berg attested in his declaration that Aguilar probably "lack[ed] the substantial capacity to understand the nature and consequences of his actions," this declaration conflicted with Dr. Berg's own deposition testimony in which the doctor said he (1) believed that Aguilar probably knew he was shooting a gun, and (2) had no opinion as to whether Aguilar comprehended that shooting the gun at Jacobs would injure her.

The trial court properly rejected Dr. Berg's declaration as contrary to facts established by his deposition. ■ A court may disregard a declaration, prepared for purposes of a summary judgment motion, which conflicts with deposition testimony of the declarant. (*D'Amico* v. *Board of Medical Examiners* (1974) 11 Cal.3d 1, 21-22 [112 Cal.Rptr. 786, 520 P.2d 10]; *Preach* v. *Monter Rainbow* (1993) 12 Cal.App.4th 1441, 1451 [16 Cal.Rptr.2d 320]; *Nunez* v. *R'Bibo* (1989) 211 Cal.App.3d 559, 563 [260 Cal.Rptr. 1].)

We conclude no triable issue of material fact exists with respect to Aguilar's cognitive capacity to commit a willful act.

The only question in this case is whether irresistible impulse induced by mental disorder, i.e., the volitional incapacity to control one's conduct despite cognitive capacity, constitutes a basis for a finding of insanity under section 533.

III. *Irresistible Impulse Is Not an Element of Legal Insanity Under Section 533*

■ Plaintiffs contend irresistible impulse stemming from a mental defect or disorder may negate a "willful act" under section 533, despite the

person's cognitive capacity to know the nature, consequences, and wrongfulness of his or her actions. We disagree.[9]

## A. *The Issue on Review Is Not Settled by Established Case Law*

Contrary to plaintiffs' position, no controlling California case makes volitional capacity an element of insanity in section 533 cases.

### 1. *Marceau v. Travelers' Ins. Co.*

We begin with *Marceau* v. *Travelers' Ins. Co., supra,* 101 Cal. 338, where a widow sued an insurer to recover under the life insurance policy of her husband, who was shot to death by a third party. The insurer invoked an express policy exclusion for intentional injuries. (*Id.* at p. 341.) The jury returned a verdict in favor of the widow, and the insurer appealed. The insurer conceded that if the killer was insane at the time of the shooting, the insurance policy remained in full force and effect. (*Ibid.*)

However, as pertinent, the insurer attacked a jury instruction, which assertedly had the effect of including within the definition of insanity the failure to resist an "irresistible impulse," contrary to the standard established in the criminal law of this state.

The allegedly offensive instruction read: " 'The court instructs you that if you believe, from a preponderance of the evidence, . . . that [the insured], at the time of inflicting said injuries, was insane and incapable of discerning between right and wrong in regard to the act he was committing, *or that he was then impelled in so doing by an insane impulse, which the reason that was left him did not enable him to resist, or to understand its nature,* then the injuries were unintentional on the part of [the killer] . . . within the meaning of said policy.' " (*Marceau* v. *Travelers' Ins. Co., supra,* 101 Cal. at pp. 345-346, italics added.)

The Supreme Court said: "In *Hoin's Case* [*People* v. *Hoin* (1882)] 62 Cal. 120, 45 Am.Rep. 651, insanity, as recognized in our criminal law, is declared to be such a diseased and deranged condition of the mental faculties as to render the person incapable of distinguishing between right and wrong in relation to the particular act with which he is charged." (*Marceau* v. *Travelers' Ins. Co., supra,* 101 Cal. at p. 342.)

"The latter portion of [the challenged] instruction, beginning with the conjunction 'or,' does not strictly follow the beaten paths established by this

---

[9]The laboring oar on appeal has been borne by Jacobs, with the administrator of Aguilar's estate filing a joinder in Jacobs's briefs.

court in declaring what constitutes insanity, and beaten paths are always safer than new and untried ones; and while, owing to the peculiar wording of the instruction, it is not probable that it in any degree enlightened the jury as to the law of the case, yet upon a fair construction, we think it comes within the law of insanity as legally applicable to the present case, and vaguely states in a different form the same principle found in the former portion of the instruction. If a man commits a homicide under an insane impulse, and at the time does not possess sufficient reason to understand the nature of the act, he certainly is in such a condition of mind that he is incapable of weighing the moral qualities of the act, and determining therefrom whether it is right or wrong; and we think this to be its legitimate construction. The instruction surely bears no relationship to the theory of irresistible impulse, frowned upon and rejected in *People* v. *Hoin* [(1882) 62 Cal. 120], and does not, either in letter or spirit, countenance the doctrine, which is there cast out, as having no place in the law of insanity in this state. In addition to this instruction, the court fully and correctly stated to the jury the law of insanity in numerous other portions of its charge, and we are satisfied that no material injury resulted to defendant from the charge we have just considered." (*Marceau* v. *Travelers' Ins. Co.*, *supra*, 101 Cal. at p. 346.)

Suffice it to say the Supreme Court in *Marceau* bent over backwards to avoid recognizing irresistible impulse as an independent test of insanity in a civil insurance coverage case. *Marceau* does not clearly determine the issue tendered in this case.

### 2. *Clemmer v. Hartford Insurance Co.*

Plaintiffs rely on *Clemmer* v. *Hartford Insurance Co.*, *supra*, 22 Cal.3d 865, for the proposition that "willfulness" under section 533 incorporates a volitional as well as a cognitive element, i.e., that in order for coverage to be barred the insured must not only know what he is doing but be able to control his conduct. However, as will appear, *Clemmer* did not consider or decide whether volitional incapacity is an element of sanity under section 533.

In *Clemmer*, the insured shot and killed his employer, Dr. Clemmer, the day after being fired. (*Clemmer* v. *Hartford Insurance Co.*, *supra*, 22 Cal.3d at p. 871.) Just before the shooting, the insured, from his apartment window, saw the employer at a nearby gas station. The insured put a pistol in a shoe box, placed the box in his car, and drove to the gas station. He got out of the car with the gun, approached the employer, greeted him, shot him four times, then knelt close to the victim and at close range shot him a fifth time in the head. (*Id.* at p. 872.) He remarked that he "knew what he was doing" and that the victim was destroying him professionally. (*Ibid.*)

The insured in *Clemmer* was convicted of second degree murder, following withdrawal of his insanity plea. (*Clemmer* v. *Hartford Insurance Co.*, *supra*, 22 Cal.3d at p. 872.) The victim's widow and son filed a wrongful death action and obtained a default judgment. They then brought an action against the insurer to recover the amount of the judgment. (*Id.* at p. 872.) The insurer asserted section 533 as a defense. (22 Cal.3d at p. 872.) At trial, the plaintiffs presented expert opinion of a psychiatrist, who "testified, on the one hand, that [the insured] had the mental capacity to know what he was doing and to know the nature and quality of his acts, but he also testified that [the insured] was a paranoid personality throughout his professional life, that he suffered an acute paranoid episode when Dr. Clemmer sought to terminate their professional relationship, and that [the insured], at the time he shot Dr. Clemmer, did not have the mental capacity to deliberate and premeditate or to form the specific intent to shoot and harm the victim and did not understand the consequences of his act, being then directed by paranoid delusions." (*Clemmer* v. *Hartford Insurance Co.*, *supra*, 22 Cal.3d at p. 878.)

The *Clemmer* jury awarded a money judgment in favor of the plaintiffs, finding by special verdict that the insured lacked the mental capacity to intend to shoot and harm the victim and lacked the capacity to govern his own conduct. (*Clemmer* v. *Hartford Insurance Co.*, *supra*, 22 Cal.3d at p. 873.) The trial court denied defense motions for judgment notwithstanding the verdict and to vacate the judgment, but the court granted the defense motion for a new trial on the grounds of insufficiency of the evidence to support the verdict. (*Ibid.*) The trial court compared the conflicting expert evidence and rejected the opinion of the plaintiffs' expert as "absurd." (*Id.* at p. 888.) The trial court believed a different result would have been reached had the lawsuit been between two individuals rather than a widow and fatherless child against an insurance company. (*Ibid.*)

In the course of affirming the trial court's rulings, the *Clemmer* court rejected the insurer's challenge to a jury instruction telling the jury that the conduct was not willful if, at the time of the shooting, the insured was suffering from a mental disease or defect of such magnitude that he could not have "the mental capacity to intend to shoot and harm Dr. Clemmer" or "the mental capacity to govern his own conduct."[10] (*Clemmer* v. *Hartford Insurance Co.*, *supra*, 22 Cal.3d at p. 886.)

---

[10]The jury instruction in *Clemmer*, given to assist the jury in answering the question whether the death of Dr. Clemmer was caused by a willful act of the insured, stated: " 'If you find by a preponderance of the evidence that [the insured] had the mental capacity to intend to shoot and harm Dr. Clemmer when he caused his death, *as well as the mental capacity to govern his own conduct*, you will answer this question "Yes." [¶] If on the other hand, you find that at that time [the insured] was suffering from a mental disease or defect of such magnitude that he could not form the mental state I have just mentioned, then you will answer

Because *Clemmer* upheld the use of this jury instruction, plaintiffs in the case before us believe *Clemmer* mandates a volitional element to "willful act," i.e., that the insured must have the capacity to govern his conduct. However, in *Clemmer* the appellant raised no specific challenge to the volitional aspect of the jury instruction regarding capacity "to govern [one's] own conduct." Instead, the Supreme Court explained the issue before the court as follows:

"[The insurer] urges that the term 'willful' as used in the question presented to the jury should have been defined not in terms of [the insured's] mental capacity and mental state (as the instruction given defined it) but rather in terms of conduct 'more blameworthy than the sort of misconduct involved in ordinary negligence' (as [the insurer's] proffered instruction defined it . . .). The instruction given, [the insurer] asserts, had the effect of requiring the jury to find the existence of what amounted to a specific intent to kill in order to find willfulness. It is clear, however, that this argument not only ignores the specific language of the instruction—which speaks in terms of intent to 'shoot and harm,' not in terms of intent to kill—but refuses to recognize the clear line of authority in this state to the effect that even an act which is 'intentional' or 'willful' within the meaning of traditional tort principles will not exonerate the insurer from liability under . . . section 533 unless it is done with a 'preconceived design to inflict injury.' [Citations.] The instruction given by the trial court simply applied this principle to a situation in which the actor's capacity to harbor the requisite 'design' was placed in issue through evidence bearing upon his mental state. There was no error in this respect." (*Clemmer* v. *Hartford Insurance Co., supra,* 22 Cal.3d at p. 887.)

Thus, *Clemmer* merely held there must be a preconceived design to inflict harm. The Supreme Court did not address the definition of capacity; it did not consider or decide whether an absence of volitional capacity alone, as opposed to cognitive capacity, could negate the requisite mental state. Although the instruction given to the jury included a volitional component, the insurer in *Clemmer* made no challenge to that aspect of the instruction. Cases are not authority for propositions not considered. (*People* v. *Harris* (1989) 47 Cal.3d 1047, 1071 [255 Cal.Rptr. 352, 767 P.2d 619]; *Ginns* v. *Savage* (1964) 61 Cal.2d 520, 524, fn. 2 [39 Cal.Rptr. 377, 393 P.2d 689].)

Plaintiffs infer that the cognitive versus volitional definition of mental capacity was at issue in *Clemmer* because the jury instruction proffered by

the question "No." ' " (*Clemmer* v. *Hartford Insurance Co., supra,* 22 Cal.3d at p. 886, italics added.)

the insurer contained a cognitive component but not a volitional component.[11] (*Clemmer* v. *Hartford Insurance Co., supra,* 22 Cal.3d at p. 887, fn. 13.) However, neither the insurer's contentions on appeal nor the Supreme Court's discussion contained any reference to the distinction between cognitive and volitional capacity. Moreover, the evidence at trial related to cognitive capacity. (*Id.* at p. 878.)

Plaintiffs assert *Clemmer* "looked to" a New Jersey case, *Ruvolo* v. *American Cas. Co.* (1963) 39 N.J. 490 [189 A.2d 204], which held irresistible impulse could negate a willful act. However, *Clemmer* did not analyze the New Jersey case but merely included it in a string citation in a footnote referring the reader to cases in other jurisdictions on this topic. (*Clemmer* v. *Hartford Insurance Co., supra,* 22 Cal.3d at p. 887, fn. 14.)

Thus, *Clemmer* does not stand for the proposition that volitional capacity is necessary to a "willful act" under section 533.

To the extent that plaintiffs suggest a person without volitional capacity has no preconceived design to injure, that position is refuted by plaintiffs' own experts, whose deposition testimony reflects that actions under an impulse control disorder are "in sync" with what the person wants, i.e., "the act is ego-syntonic in that it is consonant with the immediate conscious wish of the individual . . . ."

### 3. *J. C. Penney Casualty Ins. Co. v. M. K.*

The Supreme Court has more recently explained *Clemmer* in *J. C. Penney Casualty Ins. Co.* v. *M. K., supra,* 52 Cal.3d 1009, which held as a matter of law section 533 excludes insurance coverage for an insured's sexual molestation of a child, notwithstanding the asserted absence of the insured's subjective intent to harm, since sexual molestation is always wrongful and inherently harmful to a child. *J. C. Penney* explained that *Clemmer*'s "preconceived design to inflict injury" requirement comes into play only where there is evidence the insured lacked the mental capacity to commit the act. (*J. C. Penney Casualty Ins. Co.* v. *M. K., supra,* 52 Cal.3d at p. 1023.)

In *J. C. Penney,* a 39-year-old man sexually molested a 5-year-old girl. He pled guilty to violation of Penal Code section 288, subdivision (a), admitting

---

[11]The jury instruction proffered by the insurer in *Clemmer* was: " 'An act is a "willful act" within the meaning of the question you are to decide . . . if the act is more blameworthy than the sort of misconduct involved in ordinary negligence, that is, if the act was performed with an improper motive or purpose. . . . [Definition of negligent act.] [¶] On the other hand, a person willfully harms another when he knows and understands what he is doing and has the purpose of intending to harm him.' " (*Clemmer* v. *Hartford Insurance Co., supra,* 22 Cal.3d at p. 887, fn. 13.)

he intended to molest her and none of his sexual acts were accidents. (*J. C. Penney Casualty Ins. Co.* v. *M. K.*, *supra*, 52 Cal.3d at p. 1014.) The child and her mother secured a money judgment in a civil action against the molester and sought payment under the molester's homeowners insurance policy. The insurer filed a declaratory relief action based on section 533. The victims argued the molestations were not willful "because the molester meant no harm and his repeated debauchery of the child was merely a misguided attempt to show love and affection for her." (52 Cal.3d at p. 1014.)

The Supreme Court's response was: "No rational person can reasonably believe that sexual fondlings, penetration, and oral copulation of a five-year-old child are nothing more than acts of tender mercy." (*J. C. Penney Casualty Ins. Co.* v. *M. K.*, *supra*, 52 Cal.3d at p. 1019.)

The victims in *J. C. Penney* argued that in accordance with *Clemmer*'s mandate of coverage absent evidence of a "preconceived design to inflict injury," they should be allowed to present psychiatric testimony that the insured lacked such a preconceived design. (*J. C. Penney Casualty Ins. Co.* v. *M. K.*, *supra*, 52 Cal.3d at p. 1021.) The insurer joined numerous insurance groups appearing as amici curiae in arguing *Clemmer* should be limited or overruled. (*Id.* at pp. 1021-1022.) The Supreme Court declined to limit or overrule *Clemmer* but instead accepted the insurer's alternate argument that *Clemmer* "is not contrary to the near-unanimous line of decisions that have denied insurance coverage for child molestation. . . . *Clemmer*, when properly understood, supports the decisions denying coverage for molestation. We therefore reject the request to limit or overrule *Clemmer*." (*J. C. Penney Casualty Ins. Co.* v. *M. K.*, *supra*, 52 Cal.3d at pp. 1021-1022.)

*J. C. Penney* explained *Clemmer*'s "preconceived design to inflict injury" requirement as follows: "The brief reference in *Clemmer* to a 'preconceived design to inflict injury' must be read in context. The inquiry in *Clemmer* was limited to the unresolved *mental capacity* of the insured, i.e., whether he was legally sane when he committed the killing. There was no issue as to whether the insured intended to shoot his victim five times (including once in the head at close range) but not to harm the victim. The dissenting Court of Appeal justice in this case correctly recognized that 'the only question in *Clemmer* was the *mental capacity* of [the insured] to intend the act; there was no holding by the Supreme Court in *Clemmer* that intent to injure, standing alone, was a dispositive issue . . . . [¶] The discussion on subjective and objective intent is misplaced unless one has evidence regarding a lack of intent to commit the act itself as was present in *Clemmer* where the defense at both the criminal and civil trials was that [the insured] was

insane and did not have the mental capacity to perform the act.' "[12] (*J. C. Penney Casualty Ins. Co.* v. *M. K., supra*, 52 Cal.3d at p. 1023, original italics.)

*J. C. Penney* concluded: "Properly understood, *Clemmer, supra*, 22 Cal.3d 865, and the cases on which it relied do not support [the victims'] view. Because the wrongful *act* of child molestation is itself the *harm*, section 533 does not require a showing of the insured's subjective intent to harm. Likewise, *Clemmer* does not require a showing by the insurer of its insured's 'preconceived design to inflict harm' when the insured seeks coverage for an intentional and wrongful act if the harm is inherent in the act itself. Section 533 precludes coverage in this case because child molestation is *always* intentional, it is *always* wrongful, and it is *always* harmful." (*J. C. Penney Casualty Ins. Co.* v. *M. K., supra*, 52 Cal.3d at p. 1025, original italics.) "Some acts are so inherently harmful that the intent to commit the act and the intent to harm are one and the same. The act is the harm." (*Id.* at p. 1026.)

The Supreme Court pointed out the victims' argument was based not on the insured's intent, but on his motive. (*J. C. Penney Casualty Ins. Co.* v. *M. K., supra*, 52 Cal.3d at p. 1026.) "Motive is relevant only to the different question of whether the conduct was wrongful, thereby giving rise to liability. For example, an insured may intentionally shoot another person in the head at point-blank range. Obviously, the insured (if sane) intends to injure. Whether the conduct is wrongful, however, will depend on the insured's motive. For example, the motive may be self-defense. If a court finds that the insured acted justifiably, it necessarily follows that the insured did not act wrongfully. In that case, there is no liability, and the application of section 533 is not at issue. If, however, the motive for the shooting is

---

[12]FIE incorrectly asserts *J. C. Penney* "took pains" to point out the unresolved mental capacity of the insured in *Clemmer* related solely to his cognitive ability to intend the act. We see no such reference in *J. C. Penney*.

Plaintiffs say "mental capacity to commit the wrongful act" under *J. C. Penney* means volitional capacity. We see no such indication in *J. C. Penney*. Plaintiffs also claim *J. C. Penney* reaffirmed that cognitive capacity alone is not sufficient to bar coverage, citing the court's language that *Clemmer* did not hold that " 'intent to injure, standing alone, was a dispositive issue.' " (*J. C. Penney Casualty Ins. Co.* v. *M. K., supra*, 52 Cal.3d at p. 1023.) However, intent to injure is not necessarily coextensive with cognitive capacity. A person may know the nature of his or her actions but be unable to distinguish between right and wrong, as where a person kills in the belief a deity has commanded the killing as a religious sacrifice. We find the Supreme Court's language somewhat ambiguous as to the cognitive test for insanity in section 533 cases, i.e., whether the test involves knowledge of all three components—the nature, consequences, and wrongfulness of one's actions. In any event, we need not decide the scope of the cognitive test of insanity or what other mental defects may negate a willful act in section 533 cases. The only question before us is whether volitional capacity is a factor.

determined to be robbery, the shooting would be wrongful and excluded from coverage by section 533. There is no motive that can justify child sexual molestation. The insured's professed motive is therefore entirely beside the point for purposes of section 533." (*J. C. Penney Casualty Ins. Co. v. M. K., supra,* 52 Cal.3d at pp. 1026-1027.)

Thus, under *J. C. Penney* evidence of intent to perform an inherently harmful and inherently wrongful act without justification suffices to trigger section 533, unless insanity is in issue. *J. C. Penney* did not define insanity. The court merely referred to mental capacity to perform the act. Moreover, the court said that "if psychiatry can satisfactorily corroborate [the] view [that child molestation is an attempt at affection] and demonstrate the need for a change in the law, the proper forum is in the Legislature, where broad-based, perhaps conflicting empirical evidence can be presented and considered." (*J. C. Penney Casualty Ins. Co. v. M. K., supra,* 52 Cal.3d at p. 1028.)

FIE argues shooting at close range is inherently harmful and wrongful and therefore is excluded from coverage as a matter of law under *J. C. Penney.* Plaintiffs contend shooting is not always or inherently harmful or wrongful, because a gun may be shot without hitting anyone or may be shot by accident or in self-defense. Both sides miss the mark.

Plaintiffs' contention is without merit. The inquiry into inherent harmfulness/wrongfulness is not limited to the act in the abstract divorced from its context. Here, aiming and shooting a gun at a person's head from a distance of a few feet, without legal justification, is inherently harmful and wrongful. As the *J. C. Penney* court said in dictum: "[A]n insured may intentionally shoot another person in the head at point-blank range. Obviously, the insured (if sane) intends to injure." (*J. C. Penney Casualty Ins. Co. v. M. K., supra,* 52 Cal.3d at p. 1026.)

Moreover, the Sixth District, applying *J. C. Penney,* held an assault without legal justification was inherently harmful and wrongful. (*Fire Ins. Exchange v. Altieri* [hereafter *Altieri*], *supra,* 235 Cal.App.3d 1352, 1359-1360, review den.) There, a teenager struck a fellow student after an exchange of insults between the victim and the assailant's friend. (*Id.* at p. 1355.) It was undisputed the assailant was not acting in self-defense. (*Id.* at p. 1359.) After a court trial of the coverage action, the trial court found coverage was mandated because, although the insured intended to hit the victim, he did not intend to hurt the victim as badly as he did. (*Id.* at p. 1354.) The appellate court reversed, noting that although *J. C. Penney* "took great pains to limit its decision to child molest cases, its statutory construction of . . . section 533 and its explication of the meaning of [*Clemmer*] is

relevant, and indeed binding, in other contexts." (*Altieri, supra*, 235 Cal.App.3d at p. 1357, fns. omitted.) *Altieri* concluded: "[The victim] was leaning over picking up his books when the assault occurred. He had no idea that [the insured] was returning to hit him. It was [the insured] who urged [his friend] to turn back the car; he stated he wanted to 'kick [the victim's] ass'; he entered into a bet as to who could hit [the victim] first; he assaulted [the victim] from behind by pulling him by the hair and punching him. He may not have intended to hurt [the victim] 'bad' but he did intend, without *any* legal justification, to hit him. [The insured's] conduct was inherently harmful and wrongful." (*Altieri, supra*, 235 Cal.App.3d at pp. 1359-1360, original italics.)

Thus, the Sixth District's decision was based not on a finding of intent to cause *some* harm, but on a finding of intent to perform an act which was inherently harmful.

█ Here, leaving aside for the moment the question of insanity, Aguilar's nonaccidental conduct in aiming and shooting the gun at Jacobs from a few feet away, without legal justification, constituted an inherently harmful and wrongful act. Therefore, no separate proof of a preconceived design to inflict injury was required.

Nevertheless, our conclusion that the act was inherently harmful and wrongful does not mean coverage was barred as a matter of law, as FIE suggests. There remains the question whether legal insanity negates the willfulness of the act. That the shooting in this case was inherently harmful does not answer the question whether irresistible impulse is a component of the test for insanity under section 533.

### 4. *Searle v. Allstate Life Ins. Co.*

FIE contends the Supreme Court *rejected* volitional capacity as an unworkable standard in *Searle* v. *Allstate Life Ins. Co.* (1985) 38 Cal.3d 425 [212 Cal.Rptr. 466, 696 P.2d 1308]. However, FIE overstates the holding of that case.

In *Searle* the Supreme Court construed a life insurance policy which excluded benefits for the insured's " 'suicide, whether sane or insane.' " (*Searle* v. *Allstate Life Ins. Co., supra*, 38 Cal.3d at p. 429.) The issue was whether the insured had suicidal intent. The question before the court was "whether suicidal intent can be negated by proof that the decedent killed himself under the compulsion of an irresistible impulse." (*Id.* at p. 441.) The answer was no. (*Ibid.*)

*Searle* held: "[I]nsanity or other mental derangement does not negate suicidal intent if the decedent is shown to have performed the self-destructive act with an understanding of its physical nature and consequences. Proof that the act was impelled by an irresistible impulse would merely establish that 'self-destruction was the very result intended, albeit by a deranged mind.' [Citation.] Thus, proof of the irresistible impulse would not be inconsistent with a finding of suicide while insane. [Citations.]" (*Searle* v. *Allstate Life Ins. Co., supra*, 38 Cal.3d at p. 441.)

Thus, *Searle* is inapposite because under the express language of the policy excluding coverage for any suicide "whether sane or insane," the proposition that insanity may have prevented the insured from governing his conduct and resisting the impulse to kill himself was irrelevant. (*Searle* v. *Allstate Life Ins. Co., supra*, 38 Cal.3d at p. 441.) *Searle* did not mention *Clemmer*. There was no need to do so, since the cases were entirely different.

FIE appears to argue the cases support rejection of irresistible impulse, because *J. C. Penney* spoke of insanity in terms of mental incapacity to perform an intentional act, and *Searle* indicated irresistible impulse does not negate the ability to perform an intentional act (of suicide). However, although there is a reference in *J. C. Penney* to mental capacity "to intend the act," other references in that decision speak of " 'mental capacity to perform the act.' " (*J. C. Penney Casualty Ins. Co.* v. *M. K., supra*, 52 Cal.3d at p. 1023.) Since the discussion in that case involved the distinction between intent to perform an act and intent to inflict injury, not the elements of an insanity test, there was no need for the court to provide a full definition of mental incapacity sufficient to negate a willful act under section 533. Thus, the issue before us in this case—whether the law will treat irresistible impulse as depriving the actor of the mental capacity to perform a willful act under section 533—was not considered or decided by the Supreme Court.

### 5. *Congregation of Rodef Shalom v. American Motorists Ins. Co.*

Plaintiffs contend the definition of insanity for purposes of section 533 is already provided by *Congregation of Rodef Shalom* v. *American Motorists Ins. Co.* (1979) 91 Cal.App.3d 690 [154 Cal.Rptr. 348]. As will appear, *Rodef Shalom* no longer provides persuasive authority, because the Supreme Court has disapproved *Rodef Shalom*'s application of rules of contract interpretation to a problem of statutory construction.

In *Rodef Shalom* a teenager set fire to a classroom wastebasket, causing substantial damage. In the insurance coverage action a psychiatrist, who began treating the boy before the fire, testified the teen had a schizoid

personality caused by mental disease and set the fire due to an irresistible impulse despite his cognitive capacity to know the nature and wrongfulness of his actions. (*Congregation of Rodef Shalom* v. *American Motorists Ins. Co.*, *supra*, 91 Cal.App.3d at pp. 693-694.)

The trial court in *Rodef Shalom* gave no jury instruction defining intentionality, finding there was no evidence of insanity under the criminal standard in effect at the time of trial, i.e., whether the insured understood the nature and quality of his act or was incapable of distinguishing between right and wrong. (*Congregation of Rodef Shalom* v. *American Motorists Ins. Co.*, *supra*, 91 Cal.App.3d at pp. 694-695.) The First District, construing an explicit "willful acts" policy exclusion considered to be synonymous with section 533 (91 Cal.App.3d at p. 695, fn. 2), held the trial court erred in relying on the criminal insanity standard and in refusing to instruct as to the insured's mental capacity in accordance with *Clemmer*. The court noted that *Clemmer* made no reference to any criminal standard of insanity, and concluded an act was not intentional within the meaning of the insurance contract's explicit exclusionary clause if the insured could not control his conduct, despite his retention of his cognitive faculties.

However, *Rodef Shalom* relied exclusively on a New Jersey case and stated: "Underlying that [New Jersey] decision were two policy considerations: first, exclusions in insurance policies are to be strictly construed against the insurer, and second, justice demands particular emphasis on that strict construction doctrine where the conduct insured against involves possible injury or damage to members of the public." (*Congregation of Rodef Shalom* v. *American Motorists Ins. Co.*, *supra*, 91 Cal.App.3d at p. 697, citing *Ruvolo* v. *American Cas. Co.*, *supra*, 189 A.2d 204.)

*Rodef Shalom* has been disapproved by the Supreme Court insofar as that decision held the same standard of interpretation applies to contracts and section 533. Thus, the *J. C. Penney* court said: "The Court of Appeal [in *J. C. Penney*], relying on a prior decision, incorrectly stated that section 533 is subject to the rule of strict construction against an insurer. Not so. The premise of the strict-construction rule is that an insurance policy is an adhesion contract drafted by the insurer, which therefore must be held responsible for any ambiguity. [Citation.] Section 533, however, is a statute. It is subject to the rules of statutory construction, not the rules of contract interpretation. We disapprove the contrary view stated by the Court of Appeal and the portion of the prior opinion on which it relied, [*Rodef Shalom*]." (*J. C. Penney Casualty Ins. Co.* v. *M. K.*, *supra*, 52 Cal.3d at p. 1020, fn. 9.)

Plaintiffs argue *J. C. Penney* disapproved only one aspect of *Rodef Shalom*. However, that one aspect constituted the underpinning for the holding

upon which plaintiffs seek to rely. Thus, *Rodef Shalom* is no longer persuasive authority, unless we reach the same conclusion under the appropriate standard of statutory construction.[13]

We are left then to decide whether, as a matter of statutory construction, "willful act" in section 533 includes an act performed under compulsion of an irresistible impulse by a person who is sane under a cognitive capacity test. We will conclude it does, and therefore coverage is barred for such an act.

B. *"Irresistible Impulse" Doctrine Does Not Apply in Section 533 Cases*

Although the criminal standard of insanity is not necessarily controlling, discussion of irresistible impulse arises most frequently in that context. We therefore look to the criminal standard for guidance.

Our Supreme Court has recently summarized the history of the criminal insanity standard in California as follows:

" 'For over a century prior to the decision in *People* v. *Drew* (1978) 22 Cal.3d 333 . . . , California courts framed this state's definition of insanity, as a defense in criminal cases, upon the two-pronged test adopted by the House of Lords in *M'Naghten's Case* (1843) 10 Clark & Fin. 200, 210 [8 Eng. Rep. 718, 722]: "To establish a defense on the ground of insanity, it must be clearly proved that, at the time of . . . committing the act, the party accused was labouring under such a defect of reason, from disease of the mind, as not to know the nature and quality of the act he was doing; *or*, if he did know it, that he did not know he was doing what was wrong." [Citation.]' [Citation.]

"In 1978, [the Supreme Court in *Drew*] abandoned the *M'Naghten* test in favor of the test proposed by the American Law Institute (hereafter sometimes ALI): ' "A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the criminality [wrongfulness] of his conduct or to conform his conduct to the requirements of law." ' [Citation.]

"In June 1982, the electorate passed an initiative measure that, among other things, established the state's first statutory definition of insanity: 'In

---

[13]Plaintiffs claim *Rodef Shalom* is "one of the leading cases nationally." However, plaintiffs' citation of cases from other jurisdictions is unavailing in light of our Supreme Court's disapproval of the standard applied in *Rodef Shalom*.

any criminal proceeding . . . in which a plea of not guilty by reason of insanity is entered, this defense shall be found by the trier of fact only when the accused person proves by a preponderance of the evidence that he or she was incapable of knowing or understanding the nature and quality of his or her act *and* of distinguishing right from wrong at the time of the commission of the offense.' ([Pen. Code,] § 25(b) . . . .)

"Despite the use of the conjunctive 'and' instead of the disjunction 'or' to connect the two prongs, [the Supreme Court] held in [*People* v. *Skinner* (1985) 39 Cal.3d 765, 769 (217 Cal.Rptr. 685, 704 P.2d 752)] 'that [Penal Code] section 25(b) was intended to, and does, restore the *M'Naghten* test as it existed in this state before *Drew*,' and that 'under that test there exist two distinct and independent bases upon which a verdict of not guilty by reason of insanity might be returned.'" (*People* v. *Kelly* (1992) 1 Cal.4th 495, 532-533 [3 Cal.Rptr.2d 677, 822 P.2d 385], original italics, original brackets.)

Additionally, in 1981 California by statute eliminated irresistible impulse as a defense in criminal cases. (Stats. 1981, ch. 404, § 4, p. 1592.) Thus, Penal Code section 28, subdivision (b), provides in relevant part: "As a matter of public policy there shall be no defense of . . . irresistible impulse in a criminal action or juvenile adjudication hearing."

■ Thus, with the short-lived exception of the *Drew* decision, this state has historically rejected and currently rejects irresistible impulse as an element of insanity in criminal cases.[14]

An early disapproval of the doctrine of irresistible impulse in this state is found in the 1882 case of *People* v. *Hoin* (1882) 62 Cal. 120. There, the trial court refused a criminal defendant's request that the jury be instructed the " 'mere intellectual knowledge of right and wrong is not enough to defeat a defense of insanity, unless with such knowledge the defendant also has the volitional power to choose the one instead of the other. . . .' " (*Id.* at p. 121.) The Supreme Court found no error, stating in part:

" '[T]he excuse of an irresistible impulse co-existing with the full possession of reasoning powers might be urged in justification of every crime known to the law, for every man might be said, and truly, not to commit any crime—except under the influence of some irresistible impulse. Something more than this was necessary to justify an acquittal on the ground of insanity, and it would therefore be for the jury to say whether . . . the impulse under which the prisoner had committed this deed was one which altogether deprived him of the knowledge that he was doing wrong.'

---

[14]We note *Drew* was still in force at the time *Clemmer* and *Rodef Shalom* were decided.

"It will be seen that the English Courts have refused to recognize the co-existence of an impulse *absolutely* irresistible with capacity to distinguish between right and wrong with reference to the act. It can not be said to be irresistible because not resisted. Whatever may be the abstract truth, the law has never recognized an impulse as uncontrollable which yet leaves the reasoning powers—including the capacity to appreciate the nature and quality of the particular act—unaffected by mental disease. No different rule has been adopted by American Courts." (*People* v. *Hoin, supra,* 62 Cal. at p. 123, original italics.)

The inherent methodological difficulties with an irresistible impulse test, which were recognized in *Hoin,* continue in modern times. Thus, in 1983 the American Psychiatric Association issued its Statement on the Insanity Defense, stating in part: "Many psychiatrists . . . believe that psychiatric information relevant to determining whether a defendant understood the nature of his act, and whether he appreciated its wrongfulness, is more reliable and has a stronger scientific basis than, for example, does psychiatric information relevant to whether a defendant was able to control his behavior. *The line between an irresistible impulse and an impulse not resisted is probably no sharper than that between twilight and dusk.* . . . The concept of volition is the subject of some disagreement among psychiatrists. Many psychiatrists therefore believe that psychiatric testimony (particularly of a conclusory nature) about volition is more likely to produce confusion for jurors than is psychiatric testimony relevant to a defendant's appreciation or understanding. [¶] Another major consideration in articulating standards for the insanity defense is the definition of mental disease or defect. . . . It was assumed by the law that [personality] disorders could impair behavior control. But this is generally not the experience of psychiatry. . . . [¶] In practice there is considerable overlap between a psychotic person's defective understanding or appreciation and his ability to control his behavior. Most psychotic persons who fail a volitional test for insanity will also fail a cognitive-type test when such a test is applied to their behavior, thus rendering the volitional test superfluous in judging them." (Am.J. Psychiatry (June 1983) at p. 685, italics added.)

The American Psychiatric Association thus endorsed the following proposed standard of insanity which contains no volitional component: "A person charged with a criminal offense should be found not guilty by reason of insanity if it is shown that as a result of mental disease or mental retardation he was unable to appreciate the wrongfulness of his conduct at the time of the offense. [¶] As used in this standard, the terms mental disease or mental retardation include only those severely abnormal mental conditions that grossly and demonstrably impair a person's perception or understanding of reality and that are not attributable primarily to the voluntary

ingestion of alcohol or other psychoactive substances." (Am.J. Psychiatry, *op. cit. supra,* at p. 685.)

The history of the federal criminal insanity test is also of compelling interest. Traditionally, the federal courts adopted their own common law definitions of insanity. (See English, *The Light Between Twilight and Dusk: Federal Criminal Law and the Volitional Insanity Defense* (1988) 40 Hastings L.J. 1, fn. 3; see also, *U.S.* v. *Denny-Shaffer* (10th Cir. 1993) 2 F.3d 999, 1003, fn. 1.) These common law definitions generally included a volitional test for insanity. (English, *op. cit. supra,* at p. 2.) However, in 1984 the federal Insanity Defense Reform Act was enacted, eliminating the volitional component from the federal test of insanity. (*Id.* at p. 3.) Thus, 18 United States Code section 17, provides an insanity defense in federal criminal cases where, at the time of commission of the acts constituting the offense, ". . . the defendant, as a result of a severe mental disease or defect, was unable to appreciate the nature and quality or the wrongfulness of his acts. Mental disease or defect does not otherwise constitute a defense."

The legislative history of the Insanity Defense Reform Act, reflecting the results of extensive congressional hearings, is illuminative. (Sen.Rep. No. 225, 98th Cong., 2d Sess., p. 222 (1983), reprinted in 1984 U.S. Code Cong. & Admin. News 3182, 3404-3413; see *United States* v. *Frisbee* (N.D.Cal. 1985) 623 F.Supp. 1217, 1220-1221.) It shows various authorities suggest there is no objective basis for distinguishing between defendants who are undeterrable and those who are merely undeterred, or between the impulse that was irresistible and the impulse not resisted:

"Conceptually, there is some appeal to a defense predicated on lack of power to avoid criminal conduct. If one conceives the major purpose of the insanity defense to be the exclusion of the nondeterrables from criminal responsibility, a control test seems designed to meet that objective. Furthermore, notions of retributive punishment seem particularly inappropriate with respect to one powerless to do otherwise than he did.

"A st[r]ong criticism of the control test, however, is associated with a determinism which seems dominant in the thinking of many expert witnesses. . . .

" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

"Such a view is consistent with a conclusion that *all* criminal conduct is evidence of lack of power to conform behavior to the requirements of law. The control tests and volitional standards thus acutely raise the problem of

what is *meant* by lack of power to avoid conduct or to conform to the requirements of law which leads to the most fundamental objection to the control tests—their lack of determinate meaning.

"Richard J. Bonnie, Professor of Law and Director of the Institute of Law, Psychiatry and Public Policy at the University of Virginia, while accepting the moral predicate for a control test, explained the fundamental difficulty involved:

" 'Unfortunately, however, there is no scientific basis for measuring a person's capacity for self-control or for calibrating the impairment of such capacity. There is, in short, no objective basis for distinguishing between offenders who were undeterrable and those who were merely undeterred, between the impulse that was irresistible and the impulse not resisted, or between substantial impairment of capacity and some lesser impairment. Whatever the precise terms of the volitional test, the question is unanswerable—or can be answered only by "moral guesses." To ask it at all, in my opinion, invites fabricated claims, undermines equal administration of the penal law, and compromises its deterrent effect.'

"Professor [David] Robinson [of George Washington University] states the same idea as follows:

" 'No test is available to distinguish between those who cannot and those who will not conform to legal requirements. The result is an invitation to semantic jousting, metaphysical speculation and intuitive moral judgments masked as factual determinations.'

"Similarly, The Royal Commission on Capital Punishment stated:

" 'Most lawyers have consistently maintained that the concept of an "irresistible" or "uncontrollable" impulse is a dangerous one, since it is impracticable to distinguish between those impulses which are the product of mental disease and those which are the product of ordinary passion, or, where mental disease exists, between impulses that may be genuinely irresistible and those which are merely not resisted.' " (1984 U.S. Code Cong. & Admin. News at pp. 3408-3409, original italics, fns. omitted.)

The federal legislative history also cites the American Psychiatric Association Statement on the Insanity Defense, that the "line between an irresistible impulse and an impulse not resisted is probably no sharper than that between twilight and dusk." (1984 U.S. Code Cong. & Admin. News at p. 3410.)

Arguably and in the abstract, the criminal test for insanity should not be transported, without examination, into the civil law context, because the policies underlying the criminal and civil law are in some respects different.[15] However, in this instance, the problem with a volitional component of an insanity standard is one of inherent methodology: the very process of determining insanity under a volitional test is suspect. Consequently, that policy reason—the inherent unreliability of a volitional test for insanity—is properly transportable from the criminal to the civil law context.

In this case, we see no reason to disregard the long, hard work done by Congress in dealing with the concept of volitional incapacity or irresistible impulse. Rather, we agree with the Fifth Circuit Court of Appeals that a "majority of psychiatrists now believe that they do not possess sufficient accurate scientific bases for measuring a person's capacity for self-control or for calibrating the impairment of that capacity." (*United States* v. *Lyons* (5th Cir. 1984) 731 F.2d 243, 248.)

We therefore conclude that an incapacity to control one's conduct, or "irresistible impulse," is not a part of the legal test for insanity under section 533.[16] If we are wrong, then, as indicated by the *J. C. Penney* court, the Legislature is the proper forum to obtain recognition of controversial psychiatric theory. (*J. C. Penney Casualty Ins. Co.* v. *M. K.*, *supra*, 52 Cal.3d at p. 1028.)[17]

---

[15]Plaintiffs point out the obvious concern in criminal cases is whether punishment should be inflicted on the perpetrator of a wrongful act. Plaintiffs contrast this purpose with the concern of tort law in compensating victims. The contrast is not apt, however, because we are not deciding a question of tort law but rather a statutory limitation on the compensation of tort victims. Additionally, we note criminal cases and section 533 cases share the concern of deterring harmful acts. (*People* v. *Nash* (1959) 52 Cal.2d 36, 45 [338 P.2d 416]; *Tomerlin* v. *Canadian Indemnity Co.* (1964) 61 Cal.2d 638, 648 [39 Cal.Rptr. 731, 394 P.2d 571].)

[16]Since we conclude the doctrine of irresistible impulse does not apply in this case arising under section 533, we need not address the parties' arguments as to whether a triable issue was shown as to the existence of irresistible impulse.

[17]Both sides cite cases from other jurisdictions. (See generally, Annot., Liability Insurance: Intoxication or Other Mental Incapacity Avoiding Application of Clause in Liability Policy Specifically Exempting Coverage of Injury or Damage Caused Intentionally By or At Direction of Insured (1984) 33 A.L.R.4th 983; Salton, *Mental Incapacity and Liability Insurance Exclusionary Clauses: The Effect of Insanity Upon Intent* (1990) 78 Cal.L.Rev. 1027.) Thus, there is a split of authority on the question. However, plaintiffs fail to recognize that they rely on cases which were decided under a contract interpretation standard, not the statutory construction standard which informs our decision. Moreover, the out-of-state cases that favor plaintiffs' position did not discuss the potent legislative history of the federal insanity defense, which we find persuasive. Finally, we have seen that California, unlike other jurisdictions, has traditionally rejected the doctrine of irresistible impulse.

## IV. *Conclusion*

In this case, the evidence shows without material dispute that Jesse Aguilar acted willfully, within the meaning of section 533, when he shot Susanna Jacobs. The trial court properly entered summary judgment in favor of FIE.

### DISPOSITION

The judgment is affirmed. FIE shall recover its costs on appeal.

Sparks, Acting P. J., and Davis, J., concurred.

Appellants' petition for review by the Supreme Court was denied October 19, 1995. Mosk, J., and Kennard, J., were of the opinion that the petition should be granted.