Filed 2/8/16  Nieto v. Precision Castparts Corp. CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| YVONNE NIETO, | B259529 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC512248) |
| v. | |
| PRECISION CASTPARTS CORPORATION et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Richard L. Fruin, Jr., Judge.  Affirmed.

Law Offices of Maryann P. Gallagher and Maryann P. Gallagher for Plaintiff and Appellant.

Bryan Cave and Julie E. Patterson for Defendants and Respondents.

_____

Yvonne Nieto appeals the superior court's grant of summary judgment in favor of Precision Castparts Corporation (Precision), Avibank Manufacturing, Incorporated (Avibank), and other defendants (collectively defendants). Nieto claims a triable issue of material fact remains as to whether defendants retaliated against her after she raised concerns over possible wage and hour violations. We disagree and affirm.

We note that on appeal Nieto does not raise many of her claims before the trial court, including whether human resources (HR) employees harassed her, defendants knowingly distributed faulty airplane parts, and defendants permitted corrupt corporate practices such as petty cash theft and misuse of corporate credit cards.

## BACKGROUND

In 2008, Avibank, a subsidiary of Precision, hired Nieto as a senior payroll clerk. According to Nieto, her main duties included ensuring the accuracy of employees' reported "time and attendance" for paycheck purposes, ascertaining and applying insurance deductions, and preparing paychecks. Nieto claims that from around 2008 to 2010, employees complained they were being cheated of overtime hours and wages. Nieto gave credence to these complaints based on her experiences processing employees' time logs as a payroll clerk. From her payroll work, Nieto knew defendants used a swipe card clocking system to track employees' hours. Typically, the time entries Nieto processed for payroll purposes were entries created automatically by card swipes. Some entries were manually entered by managers, however. Entries tended to be automatically entered, however, because employees used their swipe cards to track their time and Defendants could and would easily replace lost or missing time cards. Because Nieto had this background, she concluded the rumors were true when she noticed at least one complaining employee's time log contained a large number of manual entries, which suggested to her that managers were in fact manually editing employees' time entries to unfairly reflect less or no overtime.

Nieto testified she spoke to a manager and complained to two HR administrators about the alleged missing overtime. According to her, defendants refused to adequately

2

address her complaints. After supposedly being ignored, Nieto took matters into her own hands and paid at least one employee for overtime he claimed to have worked. That employee supposedly told other employees to ask Nieto to do the same for them, although it is unclear whether Nieto did.

In early March 2011, Nieto claims she sent Alejandro "Alex" Carrillo, Avibank's director of HR, and Celia Mejia, Avibank's sister company's (AVK) HR representative, an e-mail regarding the complaining employee's manual time entries and the overtime violation implications. Nieto does not have a copy of this e-mail,[1] and defendants say they were unable to locate it during discovery, even with access to Nieto's work e-mail account. Nieto testified she never received a response to her e-mail, and defendants produced no responses from Carrillo or Mejia. Nieto could not recall speaking in person with Carrillo and Mejia about the e-mail.

Defendants did, however, produce an e-mail dated April 8, 2011, from Nieto to Mejia, where Carrillo was not copied. Nieto wrote: "Celia, [In r]eference to [a particular employee], I assume his supervisor fix [*sic*] his hours on for [*sic*] this Saturday. Did he work this Saturday? If so my apologies I assumed he had fixed it. . . . Also doe[s] this employee forget his badge or miss punches on a daily basi[s?] I have just notice[d] that they are all manually entered[—]this can raise a concern for auditor. FYI."

On March 30, 2011, Nieto received a formal written counseling statement from Carrillo and Survesh Jith, Avibank's controller. Carrillo and Jith described Nieto's work as inaccurate and inefficient. More specifically, they asserted Nieto failed to review key deduction information for accuracy, which was part of her job, and had taken two weeks to "complete a simple reconciliation [of] expected payroll deduction[s] vs. actual deductions for 18 AVK salaried employees." In addition, Nieto purportedly committed

---

[1] In a letter to Precision's CEO regarding her various accusations, Nieto claimed to have "e-mail[ed] proof to my own computer to protect myself," including "forward[ing] *all* evidence of what happened." (Italics added.) It is unclear, however, exactly what information she forwarded, where she forwarded this information, and why, if she had forwarded *all* the evidence, she herself did not have a copy of the critical e-mail she allegedly sent to Carrillo and Mejia.

"numerous errors" regarding "employee pay information that continue to occur on an ongoing basis." Jith and Carrillo concluded the incidents "reflect[ed] Yvonne['s] lack of sense of urgency, poor standards of workmanship & unsatisfactory performance i[n] performing her key responsibilities." Nieto responded in writing, detailing why she believed the counseling was unfounded and unfair.

On April 14, 2011, Nieto left work early. Defendants claim they were planning to tell her at the end of her shift they had decided to "eliminate" her position because they were installing ADP Enterprises software, which would render the majority of her tasks duplicative and unnecessary, thereby making her position obsolete. Because Nieto left early, defendants never informed her of their decision. After departing on the 14th, Nieto began a workers' compensation leave and did not return to work.

Nieto later applied for unemployment benefits, but the Employment Development Department (EDD) denied her request on June 25, 2012. On July 3, 2012, Nieto appealed that decision. In an attached letter, Nieto mentioned disputes among corporate personnel and unaddressed allegations of defective airplane parts as the reasons she was forced to leave Avibank; noticeably absent was any reference to overtime issues. A California Unemployment Insurance Appeals Board (CUIAB) administrative law judge (ALJ) reversed the EDD. Shortly thereafter, Avibank appealed the reversal. On October 12, 2012, a second CUIAB ALJ upheld the first CUIAB ALJ.

On July 17, 2012, Nieto filed a complaint with the Department of Fair Employment and Housing (DFEH), alleging defendants had retaliated against her, in part, "for being a whistleblower" and she was "force[d] to leave Avibank due to anxiety & depression." As proof of her allegations, she attached a letter, dated eight days later, July 25, 2012, to Precision's CEO, Mark Donegan, where she identified herself as the "former Sr. Payroll clerk at Avibank Mfg."[2] Under a section entitled "Timecards," Nieto claimed, "Employee timecards have been manipulated so that they won't show overtime

---

[2] The record also contains what appear to be other versions, or perhaps drafts, of this letter which omit the word "former."

4

to please corporate."  The proof Nieto offered in the next sentence of this alleged violation was that "[a]n asterisk next to the employee's timecard shows when a change has been made."  Presumably as evidence that these types of entries suggested timecard tampering to cheat employees from overtime pay, Nieto claimed she sent "an e-mail to Alex [Carrillo] and Celia [Mejia] right before I left in reference to an employee on the AVK payroll."  Nieto concluded the section by warning that "[e]mployees who have brought up problems that have occurred at the job to [a manager] were later given written notice, fired or forced to leave.  Employees are aware of this and do not 'question problem occurrences' again."[3]

As to the year that passed between her last day in the office and the letter, Nieto claimed to have been prevented from raising the enumerated issues due to "major migraines," "lack of sleep," and bad health.  Although she professed to wishing she could return to Avibank, she claimed there was no hope to do so because she was under "attack" and was being forced out.

One year after filing her DFEH complaint, Nieto filed the instant complaint on July 17, 2013, for three counts:  (1) violation of whistleblower protections under Labor Code section 1102.5;[4] (2) wrongful constructive termination in violation of public policy; and (3) intentional infliction of emotional distress (IIED).  Defendants moved for summary judgment.  The court granted the summary judgment, reasoning, in part, that Nieto failed to establish she submitted a protected report to a government agency or participated in a protected action adverse to her employer.  The court also found Nieto failed to present substantial evidence of pretext or prove defendants constructively discharged her.  Finally, the court determined she had not demonstrated the "'outrageous conduct'" necessary to substantiate an IIED claim.  Nieto appealed.

---

[3] Nieto also advised, "You will probably need to speak to several employees to obtain their stories & verification of specifics."

[4] Undesignated statutory references are to the Labor Code.

## DISCUSSION

On appeal, Nieto contends we should reverse the summary judgment because triable issues of fact remain as to whether defendants terminated or constructively discharged her. We disagree and affirm.

We review a grant of summary judgment de novo. (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 334.) That is, we consider "all of the evidence the parties offered in connection with the motion (except that which the court properly excluded) and the uncontradicted inferences the evidence reasonably supports." (*Merrill v. Navegar, Inc.* (2001) 26 Cal.4th 465, 476.) When considering all the evidence, we "'view the evidence in the light most favorable to the plaintiff[] . . .' and 'liberally construe plaintiff[']s] evidentiary submissions and strictly scrutinize defendant[']s] own evidence, in order to resolve any evidentiary doubts or ambiguities in plaintiff[']s] favor.' [Citation.]" (*McDonald v. Antelope Valley Community College Dist.* (2008) 45 Cal.4th 88, 96–97.) "Under California's traditional rules, we determine with respect to each cause of action whether the defendant seeking summary judgment has conclusively negated a necessary element of the plaintiff's case, or has demonstrated that under no hypothesis is there a material issue of fact that requires the process of trial, such that the defendant is entitled to judgment as a matter of law." (*Guz*, at p. 334.)

A three-part burden-shifting analysis applies in retaliation actions. (*Patten v. Grant Joint Union High School Dist.* (2005) 134 Cal.App.4th 1378, 1384 (*Patten*).) First, the plaintiff has the burden to establish a prima facie case of retaliation. (*Ibid.*) "To do that, a plaintiff must show (1) she engaged in a protected activity, (2) her employer subjected her to an adverse employment action, and (3) there is a causal link between the two." (*Ibid.*) Second, the burden shifts to defendant to rebut the prima facie showing by providing "a legitimate, nonretaliatory explanation for its acts." (*Ibid.*) Third, if the employer successfully demonstrates legitimacy, the burden shifts again to the plaintiff to "show this explanation is merely a pretext for the retaliation." (*Ibid.*)

6

**A.    Defendants did not violate section 1102.5's whistleblower protections**

Nieto argues defendants improperly retaliated against her for blowing the whistle on their alleged overtime and wage violations under section 1102.5, subdivision (b), which protects disclosures to government agencies, and subdivision (c), which protects refusal to participate in illegal activities.

**1.    Nieto failed to establish a prima facie case defendants retaliated against her after she made a protected disclosure to a government agency under section 1102.5, subdivision (b)**

Section 1102.5, subdivision (b) makes it illegal for an employer to "retaliate against an employee for disclosing information . . . to a government or law enforcement agency . . . the employee has reasonable cause to believe . . . discloses a violation of state or federal statute . . . regardless of whether disclosing the information is part of the employee's duties." (§ 1102.5, subd. (b).) A person claiming this statutory protection, as a prerequisite, must have been an employee at the time of the alleged discrimination. (*Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 288.)

Nieto asserts she made a protected disclosure when she filed a complaint with DFEH, alleging defendants retaliated against her for being a whistleblower by constructively discharging her.

Defendants argue Nieto cannot claim protection under the statute because she was not employed by Avibank when she filed her DFEH complaint. Nieto, on the other hand, says a triable issue of material fact exists as to when she was constructively discharged and a jury could find she was employed when she filed the complaint. We need not decide this issue, however. Even assuming, in Nieto's favor, Nieto was employed when she filed the DFEH complaint and the complaint was a proper disclosure, she still cannot make a prima facie case because she failed to show defendants subsequently retaliated against her.

It is undisputed Nieto did not return to work after she left on April 14, 2011. "'In order to establish a constructive discharge, an employee must plead and prove, by the usual preponderance of the evidence standard, that the employer either intentionally

7

created or knowingly permitted *working conditions* that were so intolerable or aggravated at the time of the employee's resignation that a reasonable employer would realize that a reasonable person in the employee's position would be compelled to resign.'" (*Colores v. Board of Trustees* (2003) 105 Cal.App.4th 1293, 1305, italics added.) To establish such "intolerable or aggravated" working conditions, Nieto cannot point to defendants' actions that occurred prior to her leave, for example, her counseling from Carrillo and Jith or Avibank's plan to eliminate her position, because these occurred more than a year before she filed her complaint. (*Ibid.*) Logically speaking, antecedent events cannot be retaliatory.

Although it is conceivable that an employer could create "intolerable or aggravated" working conditions during a period of an employee's absence from his or her employment after a government complaint was filed such that an employee could not reasonably be expected to return, Nieto did not argue or prove such conditions here. That is, she did not argue that while she was on leave, defendants created such an "intolerable or aggravated" atmosphere in her absence that was different from when she left *because* she filed the DFEH complaint that she could not return to work. (*Turner v. Anheuser-Busch, Inc.* (1994) 7 Cal.4th 1238, 1249–1250 (*Turner*) [an "employer must either deliberately create the intolerable working conditions . . . or, at a minimum, must know about them and fail to remedy the situation"].) Instead, Nieto argued "she was constructively discharged after she filed a claim for unemployment and she received a decision in her favor." This argument is unconvincing, however, because it again fails to address what retaliatory action *defendants* took subsequent to the DFEH filing such that Nieto was unable to return to work. Any suggestion that defendants' opposition to Nieto's receiving unemployment is retaliation is unavailing: defendants had a right to argue against the EDD's determination Nieto was unemployed and, if anything, showed they believed Nieto was still an employee who may return to work. (See generally *Williams v. Taylor* (1982) 129 Cal.App.3d 745, 753–754 (*Williams*) [protecting even potentially slanderous statements an employer made to the EDD as "absolutely

8

privileged" because an opposite rule would prohibit important communication and expose the speaker to "a risk of liability for libel"].)[5]

We do not consider Nieto's references to the CUIAB decision, indicating she was constructively discharged under Unemployment Insurance Code section 1960, which explicitly prevents findings or evidence submitted in a CUIAB proceeding to be used in subsequent legal proceedings. Section 1960 provides, in pertinent part: "Any finding of fact or law . . . made by a[n] . . . administrative law judge . . . in any action or proceeding before the appeals board . . . shall not be used as evidence in any separate or subsequent action or proceeding . . . brought before a[] . . . court or judge of this state." This is because, in part, CUIAB ALJ's "'are not bound by common law or statutory rules of evidence, or by technical or formal rules of procedure,'" and the parties do not have the same incentives to litigate as they would at trial. (*Kurz v. Syrus Systems, LLC* (2013) 221 Cal.App.4th 748, 763.)

**2. Nieto failed to demonstrate she engaged in protected action under section 1102.5, subdivision (c)**

Section 1102.5, subdivision (c) makes it illegal for an employer to "retaliate against an employee for refusing to participate in an activity that would result in a violation of state or federal statute." (§ 1102.5, subd. (c).)

Nieto asserts she refused to participate in "masking" defendants' overtime and wage violations by refusing to process illegally altered timecards and defendants retaliated by improperly writing her up and unnecessarily eliminating her position. She also argues she was retaliated against by constructive discharge after she complained by letter to Precision's CEO.

---

[5] To this point, we will not impute the EDD's initial action denying Nieto unemployment to Avibank because Avibank had no control over the independent governmental proceedings or their outcome. (*Turner*, *supra*, 7 Cal.4th at p. 1244 ["Constructive discharge occurs when the *employer's conduct* effectively forces an employee to resign" italics added].)

9

**a.    Nieto failed to present sufficient admissible evidence to create a triable issue of material fact, at the prima facie stage, that she was engaged in a protected activity**

**i.    Nieto's declaration does not demonstrate she engaged in protected activity**

To support her protected activity claim, Nieto first cites to her declaration. Paragraph 1 contains no evidence as it is simply a statement of personal knowledge. Paragraphs 2 and 3 relate to issues not on appeal. We therefore do not consider the first three paragraphs. Paragraph 4 states: "One of the major issues I was seeing was that managers were manually changing employees['] time records to deprive them of overtime. [F]or example, [i]f an employee punched in at 8:30 and worked an extra hour, the manger would change the punch in time to 9:30 so that the employee would not get overtime."

Nieto's deposition testimony, however, exposed her lack of personal knowledge to make this statement. Nieto did not "see" managers change employees' time entries to cheat them out of overtime, as she claims. Rather, she had heard rumors employees suspected this was occurring and gave credence to those rumors because she saw manual entries on certain employees' time logs, which *could be* consistent with such a practice. While Nieto testified she told one supervisor not to alter employees' timecards to exclude overtime, she offered no evidence she investigated the allegations to substantiate them and confirm the manual entries were not innocent. Nieto was also not involved in a formal investigation into the allegations and, at most, heard only bits of information about the investigation's preliminary findings secondhand from Cardenas, the investigator. Nieto also admitted she never verified whether the employees had actually worked the overtime they claimed they did.

Further, although not required, Nieto failed to present even one time log or any analysis of a time log in the record which would show illegal tampering. (See generally *Green v. Ralee Engineering Co.* (1998) 19 Cal.4th 66, 87 [employees "need not prove an actual violation of law" because "reporting" "'reasonably based suspicions'" of illegal

10

activity suffices].) Nieto's conclusory and unfounded statement will not be considered evidence she refused to participate in illegal activity when her deposition testimony showed she had no objective evidence to reasonably believe the activity was illegal. (Evid. Code, § 702 ["the testimony of a witness concerning a particular matter is inadmissible unless he has personal knowledge of the matter"]; *Jacobs v. Fire Ins. Exchange* (1995) 36 Cal.App.4th 1258, 1270 (*Jacobs*), citing *D'Amico v. Board of Medical Examiners* (1974) 11 Cal.3d 1, 21–22 ["A court may disregard a declaration, prepared for purposes of a summary judgment motion, which conflicts with deposition testimony of the declarant"].)

Nieto then states in paragraph 5: "Employees were coming to me because their managers were refusing to help correct this illegal practice so I would correct it for them to make sure they got paid the correct amount." Again, Nieto admitted she had no personal knowledge of managers "refusing to help" employees "correct" the "illegal practice" of cheating them out of their overtime, and we therefore disregard that portion of her statement. (Evid. Code, § 702; *Jacobs*, *supra*, 36 Cal.App.4th at p. 1270.) As for Nieto "correcting" overtime "errors," she admitted she did not verify whether the workers had actually worked the hours they claimed or whether the manual entries were improper. We therefore likewise do not consider the statement as evidence Nieto refused to participate in an illegal activity or acted adversely to defendants. (Evid. Code, § 702; *Jacobs*, *supra*, 36 Cal.App.4th at p. 1270.)

In paragraph 6, Nieto states: "The managers were under pressure to keep overtime costs down." As a payroll clerk, Nieto would have no personal knowledge of corporate executives pressuring supervisors, who worked in a different sector of the company in a different building, to keep overtime costs down. Nieto presented no evidence showing she had personal knowledge of such a fact, and we therefore disregard this speculative statement. (Evid. Code, § 702.)

In paragraph 7, Nieto claims she "confronted her superiors" about the alleged overtime violations by sending an e-mail to Carrillo and Mejia. But, even by Nieto's own account of this missing e-mail, she did not engage in a protected activity. In her

11

declaration, Nieto described the e-mail as "telling" Carrillo and Mejia "that I had seen an alarming number of manual changes for one certain employee (this deprived the employee of overtime pay) and that this had been ongoing for a long time, and this should not be happening." Again, Nieto admitted in her deposition she did not actually know whether the manual changes "deprived the employee of overtime pay." She testified she did not know whether the employee's time was being edited (as opposed to simply manually input), and she had no way to know whether the employee was actually working the overtime hours he claimed. Like her other unfounded statements, we disregard Nieto's claim the manual time entries "deprived the employee of overtime pay" for lack of personal knowledge. (Evid. Code, § 702; *Jacobs*, *supra*, 36 Cal.App.4th at p. 1270.)

As for the remainder of the statement, merely "telling" Carrillo and Mejia she "had seen an alarming number of manual changes for one certain employee" "for a long time" and "this should not" happen is alone insufficient to demonstrate Nieto engaged in a protected activity. Her duties as a payroll clerk would include alerting her superiors to the fact that there may be an error in the measure used for paying employees. "'[D]iscussion of an action that someone might consider to be a violation of a law, rule or regulation'" does not automatically create a whistleblower cause of action because "'[d]iscussion among employees and supervisors concerning various possible courses of action is healthy and normal in any organization. It may in fact avoid a violation.'" (*Mize-Kurzman v. Marin Community College Dist.* (2012) 202 Cal.App.4th 832, 859–860, italics omitted.) Insofar as it can be instructive, the potentially responsive e-mail defendants produced speaks to this point. In the e-mail, Nieto simply asks, "doe[s] this employee forget his badge or miss punches on a daily basi[s?]," and then adds, "I have just notice[d] that" the time entries "are all manually entered[—]this can raise a concern for auditor. FYI." This type of language, on its own, does nothing more than show Nieto raised a potential payroll issue, which was within the scope of her duties to do so. Tellingly, she also stated she "*assume[d]*" the employee's supervisor had "*fixed*" his

12

hours, not that she believed the supervisor illegally tampered with the employee's time. (Italics added.)

Paragraphs 8 through 11 of Nieto's declaration do not contain any claims and therefore are not considered in this portion of the analysis.

### ii. Ramiro's and Cardenas's declarations likewise do not demonstrate Nieto engaged in protected activity

In addition to her declaration, Nieto also offered declarations of two others: Ferdinand Ramiro and Lucy Cardenas. Ramiro's declaration generally contains a description of how he believes he was being cheated of overtime, and only one paragraph concerns Nieto. That paragraph states: "I . . . asked Yvonne Nieto for help in getting paid the overtime hours I had worked. I told Ms. Nieto the issue I was having and she would ask me how many hours of overtime were missing from my check. She then took action to make sure that I was properly paid for the overtime hours that I had worked. This occurred at least three times. I then instructed my co-workers to call Ms. Nieto if they had problems with getting paid for the amount of overtime hours they had worked." Ramiro's statement does not show Nieto engaged in a protected activity; all his statement shows is that Nieto aided him in being paid for overtime hours he claimed he worked. It also does not show Nieto helped any employees beyond Ramiro as Ramiro simply says he told others to seek Nieto's help.

Cardenas's declaration describes how she was asked to investigate the overtime violation allegations. Cardenas says she asked Nieto during her investigation whether Nieto could create "another shift schedule," presumably to alleviate the problem of managers' manual time entries. Nieto took no action in response to this inquiry because, according to Nieto, she told Cardenas "a new schedule [wa]s not going to help" because she had "tried already" and "still supervisors [we]re changing" employees' "time." This statement does not show Nieto engaged in protected activity because Cardenas said Nieto took no action and, if anything, shows Nieto failed to act when she could have during a formal investigation into the matter. Cardenas's declaration contains only one other statement regarding Nieto. Like the trial court, we disregard the statement that a night

13

shift supervisor told Cardenas that Nieto "was asking" him about the overtime issue and "complaining too much because I'm changing employee[s'] time but this is what we have to do;" Nieto submits this out-of-court statement to prove the truth of her claim that she tried alerting the company to the claimed overtime fraud and we therefore disregard it as hearsay without an exception.

### b.     Nieto also failed to show defendants' actions were retaliatory or causally connected to her actions

Even assuming Nieto's action in "correcting" overtime "violations" was adverse to defendants, Nieto failed to show the actions defendants subsequently took against her were retaliatory or causally connected to her actions.

### i.     Nieto offers no evidence defendants retaliated against her after her letter to Precision's CEO

Nieto argues her letter to Precision's CEO, which included allegations of overtime violations, is a protected activity. Even construing the facts in Nieto's favor and assuming this was the case, Nieto offered no evidence defendants retaliated against her after Precision's CEO received the letter. The parties agree Nieto sent her letter in July 2012, after she stopped working for Avibank in April 2011. As discussed above, Nieto did not sufficiently argue or present evidence that defendants retaliated against her, including by constructively discharging her, after she left. Because Nieto can show no retaliatory action, her letter does not support her prima facie case.

### ii.     Performance counseling does not constitute retaliation

Employment counseling alone does not rise to the level of retaliation. (*Turner*, *supra*, 7 Cal.4th at p. 1255 ["a single negative performance rating does not amount to a constructive discharge"].) It is necessary for businesses like Avibank to counsel and discipline its employees to be able to efficiently operate, and courts consequently protect such practices. (*Soules v. Cadam* (1991) 2 Cal.App.4th 390, 401 [safeguarding employers' right to "'review, criticize, demote, transfer, and discipline employees'" without automatically placing them at risk of acting in retaliation].) Carrillo and Jith's counseling statement, regarding Nieto's inefficiency and inaccuracy, does not otherwise

14

appear to be "'manifestly unfair, outrageous, harassment, or intended to cause emotional disturbance resulting in disability.'" (*Ibid.*, quoting *Cole v. Fair Oaks Fire Protection Dist.* (1987) 43 Cal.3d 148, 160.) Such a counseling statement, which required no disciplinary action, does not rise to the level of requisite retaliation because "criticism" of "job performance—even if alleged to be unfair or outrageous—. . . does not create the intolerable working conditions necessary to support a claim of constructive discharge." (*Soules*, at p. 401.) To hold otherwise "'would thrust the judiciary into micromanaging employment practices and create a legion of undeserving protected "whistleblowers" arising from the routine workings and communications of the job site. [Citation.]'" (*Mueller v. County of Los Angeles* (2009) 176 Cal.App.4th 809, 822, quoting *Patten*, *supra*, 134 Cal.App.4th at p. 1385.)

### iii. Ramiro's and Cardenas's declarations describe actions too remote in time to be considered causally connected to defendants' actions

The actions described in Ramiro's and Cardenas's declarations are too remote to be considered causally connected to the allegedly retaliatory actions which occurred in 2011. Cardenas described conversations about the overtime issues occurring between 2007 and 2009, and stated she was terminated in 2009. Similarly, Ramiro's declaration discussed events which occurred between 2007 and early 2010. Jith was hired in October 2010 and Carrillo was not hired until 2011. Nieto presented no evidence Carrillo or Jith even knew about these conversations. As such, without an elucidating explanation to the contrary from Nieto, these events are too remote in time to be considered causally connected to defendants' alleged retaliatory actions. (*Morgan v. Regents of the University of California* (2000) 88 Cal.App.4th 52, 69 [an employer's ""'adverse action"'" must follow ""'within a relatively short time"'" after the protected activity occurs].)

15

**iv.     Nieto fails to demonstrate defendants' decision to eliminate her position was causally connected to her actions concerning the alleged overtime violations**

Defendants claim they were planning to eliminate Nieto's position because they were adopting a new software system which would render the majority of Nieto's position obsolete.[6] Defendants additionally claim Nieto failed to take opportunities they gave her to develop new skills that would make her valuable beyond the functions taken over by the software and they were planning to hire a "financial analyst" who would be able to perform functions more complex than the software performed. Nieto argues this explanation is a pretext for defendants' real motivation to force her out because she was going to expose and fight against their alleged overtime violations.

Nieto fails, however, to demonstrate a causal nexus between this allegedly retaliatory action and her claimed protected actions. (*Patten*, *supra*, 134 Cal.App.4th at p. 1384.) Nieto says the fact that defendants did not eliminate the payroll position after she left demonstrates the reason behind eliminating the position (and therefore firing her) is pretext. Defendants testified, however, that there was no need to officially eliminate Nieto's position because after Nieto left work and did not return, they installed the software and hired a financial analyst. Defendants also claim, and Nieto does not disagree, that Jith, who decided to eliminate the payroll clerk position, may not have even known about Nieto's alleged e-mail to Carrillo and Mejia. Nieto produced no other evidence demonstrating a causal nexus between the unimplemented decision to eliminate her position and her e-mail or any other action she took. As such, she failed to establish a prima facie case defendants retaliated against her for engaging in a protected action.

**B.     Defendants did not constructively discharge Nieto in violation of public policy**

On appeal, Nieto's argument for constructive discharge in violation of public policy is boiled down to one sentence stating that the discharge cause of action "arises

---

[6] Perplexingly, defendants did not offer a scintilla of evidence to support this claim other than two declarations.

from the same facts as" the whistleblower cause of action and because "the trial court improperly granted summary judgment on the entire complaint, the ruling should be reversed as to all causes of action." Unfortunately for Nieto, we agree with the trial court's decision regarding the whistleblower cause of action. In any event, courts have held that a constructive discharge in violation of public policy claim fails when it is based on the same facts as a failed section 1102.5 claim. (See, e.g., *Love v. Motion Industries, Inc.* (2004) 309 F.Supp.2d 1128, 1135 [where a section 1102.5 claim failed, so did a public policy claim].) In light of Nieto's agreement that the failed whistleblower cause of action and the discharge cause of action arise from the same set of facts, we decline to overturn the summary judgment.

## C.     Nieto's claim is time barred

Nieto's IIED claim is time barred because she brought her action on June 17, 2013, more than two years after she left Avibank in March 2011. (Code Civ. Proc., § 335.1 [personal injury claims must be brought within two years].) On appeal, Nieto herself limited the scope of defendants' actions we should consider for the IIED cause of action to those that also underlie the whistleblower claim. The offending actions, as discussed above, all occurred prior to Nieto leaving Avibank in 2011. The only possible action of defendants we could consider which occurred after Nieto left Avibank in 2011 is defendants' opposition to Nieto's unemployment claim. Again, defendants had a right to oppose Nieto's claim and Nieto does not argue anywhere that defendants' conduct during this proceeding "'exceed[ed] all bounds usually tolerated by a decent society.'" (See generally *Williams*, *supra*, 129 Cal.App.3d at pp. 753–754; *Cole v. Fair Oaks Fire Protection Dist.*, *supra*, 43 Cal.3d at p. 155, fn. 7.) We do not consider this a ground for Nieto's IIED claim, and the claim is therefore time barred.

## DISPOSITION

The judgment is affirmed.  Defendants are awarded their costs on appeal under California Rules of Court, rule 8.278.

NOT TO BE PUBLISHED.

LUI, J.


We concur:


ROTHSCHILD, P. J.


JOHNSON, J.

18